# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SCOTT SCHRAMM,

        Plaintiff,

    v.                               Case No. 09-C-1197

MICHAEL ASTRUE,

        Defendant.

## DECISION AND ORDER

        Plaintiff Scott Schramm seeks review of the decision of the Commissioner of Social Security denying him disability benefits. He asserts that the Administrative Law Judge ("ALJ") erred by not advising him of his right to be represented by counsel. Schramm also argues that the ALJ failed to properly assess his credibility. He contends that the ALJ improperly considered certain state agency reports and gave too little weight to treating sources. Finally, he argues that the ALJ erred in assessing his residual functional capacity ("RFC") and in determining whether he could perform work he had performed in the past. After careful consideration of each of Schramm's arguments, I conclude that the Commissioner's decision should be affirmed.

## STANDARD OF REVIEW

        In reviewing an ALJ's decision, a federal court examines whether it is supported by substantial evidence. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions.  *O'Connor-Spinner*, 627 F.3d at 618 (citing *Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008)).  An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying.  *Castile v. Astrue,* 617 F.3d 923, 928-29 (7th Cir. 2010).  "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).  Accordingly, credibility determinations are reversed only if they are patently wrong.  *Id.*  The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination.  Failure to do so, unless the error is harmless, also requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

## COMMISSIONER'S DECISION

Schramm filed an Application for Disability Insurance Benefits on May 16, 2006, alleging disability beginning March 22, 2006, due to bipolar disorder, depression, ADHD, hypertension, GERD-acid reflux, alcoholism (recovering), and possible heart problems.  (Tr. 12.)  He claims he first became unable to work on March 22, 2004.  (Tr. 121.)  After the Commissioner denied his application for benefits initially and upon reconsideration (Tr. 79-80), Schramm appeared at a hearing before an Administrative Law Judge ("ALJ") on February 11, 2009. (Tr. 12.)

At the time of the hearing, Schramm was forty-four years old.  (Tr. 29.)  He last worked in 2004 at a Ford dealership selling cars, a position he held for about nine months.  (Tr. 30.)  Prior to that Schramm worked at Madison General Fuels for about three months where he worked in a

recycling factory loading paper into machines that converted paper into pellets. (Tr. 33.) Prior to that he worked from 1990 to 2002 selling forklifts and related equipment. (Tr. 31.) Schramm holds a Bachelor of Science degree in business administration from the University of Wisconsin – Milwaukee. (Tr. 29.) He also earned a Masters in Business Administration ("MBA") in 2008 from the University of Wisconsin – Oshkosh. (Tr. 29.)

On April 1, 2009, the ALJ issued a written decision in which he found that, except for a short period of time in 2008, which did not meet the durational requirement, Schramm's physical impairments were not severe and resulted in no exertional limitations. (Tr. 18.) Although Schramm did have severe mental impairments, namely, bipolar disorder and ADHD, the ALJ concluded that he retained the residual functional capacity ("RFC") to perform simple, repetitive work. (Tr. 17.) In reaching this conclusion, the ALJ rejected Schramm's assertions that as a result of his mental impairment he could not concentrate, focus, and function properly. Schramm claimed he had difficulty getting along with people, could not handle the stress of a work environment, could not maintain the persistence and pace required for work and that his symptoms prevented him from undertaking full-time employment. The ALJ concluded that Schramm's "reported activities dramatically contradicted practically all of his allegations." (Tr. 19.) The ALJ emphasized that despite his claims that he could not function as a result of his mental condition, Schramm had obtained an MBA at the University of Oshkosh maintaining a B average, and he managed to live alone, perform household chores, and care for himself full-time and his three children (ages six, nine, and eleven) on a part-time basis. (Tr. 20.) The ALJ also found it highly unlikely that the Wisconsin Division of Vocational Rehabilitation, which provided him financial assistance toward obtaining his MBA, would have approved such a plan if he had made the same allegations of disability that he made to the Social Security Administration.

With respect to opinion evidence regarding Schramm's mental impairments, the ALJ gave greatest weight to the State Agency consultative psychologists who concluded he had at most moderate limitations as a result of his mental impairment in several areas. The ALJ rejected the opinion evidence of Schramm's treating psychiatrists and therapist, as well as that of a physician apparently retained by Schramm's private disability insurer, all of which suggested mental impairments of such severity as to preclude sustained employment. The ALJ found these opinions contradictory, not supported by the contemporaneous progress notes, conclusory, inconsistent with Schramm's activities, and based heavily on Schramm's subjective complaints which the ALJ found not entirely credible. The ALJ also noted that some of the opinions preceded more recent medical evidence that suggested greater functionality. (Tr. 21-22.)

Relying on the testimony of a Vocational Expert, the ALJ next found that Schramm's previous work fit within the classification of Salvage Laborer in the Dictionary of Occupational Titles. The ALJ noted that the Vocational Expert had testified that an RFC for simple, repetitive work did not preclude the work of Salvage Laborer as generally performed throughout the national economy or as actually performed by Schramm in his previous employment. (Tr. 22.) Accordingly the ALJ found that Plaintiff could return to one of his past jobs and, therefore, was not disabled. (Tr. 22-23.) The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner. (Tr. 1-2.)

## ANALYSIS

### A. Waiver of Counsel

Plaintiff first argues that the ALJ failed to obtain a valid waiver of his right to counsel. Social Security claimants have "a statutory right to counsel at disability hearings." *Thompson v.*

*Sullivan,* 933 F.2d 581, 584 (7th Cir.1991). The claimant must be properly informed of this right and may waive it only if given sufficient information to enable him to make an intelligent decision on whether to retain a lawyer or proceed pro se. *Id.* To ensure a valid waiver of counsel an ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25% of past due benefits and required court approval of fees. *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994)). If the ALJ does not obtain a valid waiver of the claimant's right to counsel, the matter must be remanded for a new hearing unless the Commissioner can establish "that the ALJ fully and fairly developed the record." *Binion,* 13 F.3d at 245. The ALJ's duty is met if he "probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Id.* If the Commissioner makes the required showing, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id.*

Here, there is no dispute that the ALJ failed to obtain a proper waiver of Schramm's right to counsel at the hearing. The Commissioner argues, however, that the rule requiring a waiver does not apply because Schramm had representation at the hearing. The Commissioner allows non-lawyers to represent claimants in social security proceedings, *see* 20 C.F.R. § 404.1705, and Schramm appeared with a non-attorney representative. The Commissioner argues that because Plaintiff appeared with representation, albeit non-attorney representation, the ALJ was not required to obtain a waiver. Noting that Schramm's non-attorney representative had some twenty years of experience handling social security cases, the Commissioner argues that the failure of the ALJ to obtain a formal waiver of counsel was at most a technical defect that does not warrant reversal.

The Commissioner cites no precedent in support of this contention and, indeed, the Seventh Circuit's decisions in *Skinner*, *Binion* and *Thompson* at least suggest that it is the right to counsel that must be waived. *See Skinner*, 478 F.3d at 841 (noting that "ALJ's failure to obtain a valid waiver of counsel heightens his duty to develop the record"; *Binion*, 13 F.3d at 245 (explaining that the ALJ must explain "the manner in which an attorney can aid in the proceedings"); *Thompson*, 933 F.2d at 584 ("A claimant has a statutory right to counsel at disability hearings.") (emphasis added). In addition, several district courts in this circuit, including this district, have specifically addressed the issue and have concluded that the presence of a non-attorney representative does not excuse the ALJ from insuring that the claimant has knowingly waived his or her right to an attorney. *See Beth v. Astrue* 494 F. Supp.2d 979, 1001 (E.D. Wis. 2007); *Koschnitzke v. Barnhart*, 293 F. Supp.2d 943, 947 (E.D. Wis.2003); *Meroki v. Halter*, No. 00-C-2696, 2001 WL 668951 (N.D. Ill. June 14, 2001); *Oyen v. Shalala*, 865 F. Supp. 497, 508 (N.D. Ill.1994)). The Commissioner has elected not to appeal any of these rulings. Given this authority, I conclude that the requirement that the ALJ obtain a proper waiver of a claimant's right to counsel applies even when a non-attorney representative appears. It thus follows that a remand is required unless the Commissioner can "show the ALJ adequately developed the record." *Binion*, 13 F.3d at 245.

Here, I conclude that the ALJ met this initial burden. The ALJ conducted a thorough hearing that lasted nearly an hour and forty minutes. (Tr. 26; 77.) The ALJ's questioning of Plaintiff covered thirty-seven transcript pages. (Tr. 29-66.) While the length or brevity of a benefits hearing is not dispositive of whether the ALJ fulfilled his obligation to adequately develop the record, *Thompson,* 933 F.2d at 584, a perfunctory hearing may be indicative of such a failure, *see, e.g., Henderson v. Barnhart,* 205 F. Supp.2d 999, 1010 (E.D. Wis.2002) (finding that the Commissioner

had not demonstrated a fully and fairly developed record where the hearing "was brief, almost perfunctory, lasting barely one-half hour"). A review of the transcript here reveals that the ALJ carefully and fully probed Schramm regarding his disabilities and their impact on his functioning. Indeed, Plaintiff points to no area that was not fully explored by the ALJ in his questioning of the claimant.

Only if the Commissioner has demonstrated full and fair development of the record is the plaintiff required to demonstrate prejudice or an evidentiary gap. *See Binion*, 13 F.3d at 245 (explaining that this shifting of the burden is necessary to give "teeth" to the waiver requirement). Here, Plaintiff argues that his burden is met by virtue of the additional evidence his sister submitted to the Appeals Council after his non-attorney representative received the unfavorable decision and dropped the case. This evidence consisted of a letter from his ex-wife (Tr. 188-190); information on Plaintiff's medical issues while in graduate school (Tr. 227-234); information on why Plaintiff left his job as a car salesman (Tr. 184); a statement from his therapist (Tr. 214); records from the division of vocational rehabilitation (Tr. 235-243); a series of statements from treating source Dr. Sovine (Tr. 248, 253, and 256); and a letter from Plaintiff's sister (Tr. 193-208). This evidence directly addresses several of the reasons the ALJ gave as reasons for rejecting Plaintiff's disability claim.

But all of the evidence submitted by Plaintiff's sister was made a part of the record and was considered by the Appeals Council in its denial of Plaintiff's request for review. (Tr. 1-5.) If this is the only evidence Plaintiff's representative failed to introduce and the ALJ failed to elicit, then Plaintiff suffered no prejudice since it was subsequently added to the record and considered by the Appeals Council. Moreover, much of the additional evidence Plaintiff's sister submitted was new,

in the sense that it did not exist at the time of the hearing. This included additional records from Dr. Beld and treatment notes from Plaintiff's therapist. Neither the ALJ, nor a claimant's representative should be faulted for failing to present evidence that did not exist at the time of the hearing. Other information submitted was cumulative to what was already in the record. To the extent the additional evidence submitted by his sister was new and material, and showed the ALJ's decision to be contrary to the weight of the evidence in the record, the Appeal Council's decision denying Plaintiff's request for review would have been in error. *See Getch v. Astrue*, 539 F.3d 473, 483-84 (7th Cir. 2008); 20 C.F.R. § 404.970(b). Plaintiff does not argue here that the Appeals Council erred.

I conclude that Plaintiff has failed to establish he suffered any prejudice from the ALJ's failure to obtain a proper waiver of his right to counsel. Accordingly, he is not entitled to relief on that basis.

## B. Credibility

Plaintiff also challenges the ALJ's determination that he was less than credible. In reviewing an ALJ's credibility determination, a court must consider the following factors:

> The ALJ's credibility determinations are entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result . . . ." *Shramek*, 226 F.3d at 811 (internal quotation marks omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Id.* (internal quotation marks omitted). Accordingly, we will overturn the ALJ's credibility determinations only if they are "patently wrong." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

*Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010).

Here the ALJ explained, in detail, his reasoning for discounting Plaintiff's credibility. The ALJ devoted several single-spaced pages of his opinion to a careful analysis of Plaintiff's credibility. (Tr. 18-20.) And none of reasons the ALJ gives for finding Plaintiff "not credible" are "patently wrong" such that reversal would be required for that reason alone. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

The ALJ discounted Plaintiff's credibility for a number of reasons. First, the ALJ noted that medical records indicated Schramm's bipolar disorder was stable on Lithium. (Tr. 18.) The ALJ also noted contradictions between Plaintiff's reported side effects and actual side effects. At the hearing Plaintiff testified he had "some medication side effects." (Tr. 19.) Plaintiff also claimed in his Disability Reports – Appeal that "some medications caused him to be 'edgy' and to have tremors." (Tr. 19.) But these claims were contradicted by Plaintiff's own Disablity Report, in which he "failed to report any medication side effects." (Tr. 19.) Moreover, the ALJ noted that the progress notes from treating sources "do not substantiate any chronic and significant medication side effects . . ." (Tr. 19.) These contradictions support the ALJ's credibility finding.

Plaintiff suggests that these inconsistencies are fully explained by the neuropsychological evaluation performed by Dr. David Leicht in April/May of 2005, which documented Schramm's impaired memory. (Tr. 332-38.) But the ALJ did not fault Plaintiff for memory lapses; he found he was not credible because he provided inconsistent information. Even a claimant's inconsistent reports might conceivably be explainable in terms of a mental illness, but an ALJ's credibility determination should not be overturned because there is a possibility of a benign explanation for inconsistencies. "Judicial review of administrative decisions is deferential." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). If a claimant's apparently inconsistent statements must be

absolutely impossible to reconcile before a claimant's credibility can be found lacking, then no claimant can ever be found incredible.

Plaintiff also challenges that ALJ's suggestion that DVR never would have provided financial assistance to him in pursuing his MBA if he had told them he had the same functional limitations that he testified to at his hearing. The ALJ speculated at one point that it was "highly unlikely" any governmental agency, such as DVR, would have approved a vocational rehabilitation program for him if he had made the same allegations to them that he made to the Agency and to the ALJ. (Tr. 20.) In fact, the DVR records submitted by Schramm's sister indicate that at his initial interview with DVR, Schramm told the interviewer that his mental health problems made it difficult for him to concentrate and they would cause him to have to leave work early or not come in at all. (Tr. 237.) But that was in 2004, shortly after Schramm's hospitalization during a time when he was non-compliant and had relapsed into alcohol abuse. (Tr. 257, 298-300.) By February 2006, Schramm was obviously more stable, and DVR was in agreement that a teaching position "should be compatible with his disability." (Tr. 241.) Certainly, it was not error for the ALJ to recognize that implicit in Plaintiff's enrolling in an MBA program and DVR's providing financial assistance to him in pursuing an MBA was the belief and expectation that he would be able to hold full-time employment upon graduation.

The primary reason the ALJ gave for discounting Schramm's credibility was his conclusion that Schramm's "reported activities dramatically contradict practically all of his allegations." (Tr. 19.) On one hand Plaintiff claims he has been disabled since March 22, 2004. Yet – the ALJ points out – since "essentially his alleged onset date, the claimant has been in school or looking for work." (Tr. 19.) He began graduate classes in February 2004. Within a year he was part way into

his MBA program.  In April 2006 he reported maintaining a "B" average in his MBA program.  In October of 2006, Dr. Sovine, his psychiatrist, noted that "patient states he is working part-time and attending school part-time and states this works better than full-time for either." (Tr. 461.)  By June of 2007 Plaintiff was sending out resumes and applying for marketing positions.  In January of 2008 he graduated with an MBA from the University of Wisconsin – Oshkosh and was actively pursuing employment thereafter.  On January 16, 2009, less than a month before his disability hearing, Schramm reported to Dr. Beld, his new psychiatrist, that he had just interviewed for a new job and expected an offer that day.  (Tr. 20, 526.)  These are hardly the activities of an individual who is unable to work in any capacity.  Armed with his graduate degree Plaintiff thought he was in line for better employment opportunities – he testified that he wanted to obtain a "marketing position" or a "teaching position." (Tr. 65.)  He applied for over 225 jobs after earning his MBA.  (Tr. 63.)  But the job search did not go well, perhaps because, as Plaintiff's testimony suggests, he was not suited for the management positions for which his MBA was intended to prepare him.  (Tr. 49, 64-65.)  The ultimate question here, however, is not what kind of job Plaintiff wanted but whether he had the functional capacity to perform any substantial gainful activity.

The ALJ also noted that the "record contains examples of symptom exaggeration." (Tr. 20.)  The ALJ picked up on the distinction between what Plaintiff reported to the Social Security Administration (that he had a "very limited ability to pay attention and difficulty following instructions") and Plaintiff's actions ("obtain[ing] an MBA degree with reportedly good grades and car[ing] for his young children").  (Tr. 20.)  Plaintiff's allegations regarding "extreme difficulty interacting with others" were contradicted by his activities – dating, going to AA, going to the YMCA, participating in graduate courses –  and the fact that Plaintiff had no difficulty interacting

with a Social Security representative who interviewed him over the telephone or at the hearing when testifying before the ALJ. (Tr. 20.)

For all of these reasons, the ALJ's credibility determination was not "patently wrong." He carefully analyzed conflicts in the evidence and testimony, as well as his activities over the past several years. Rather than merely re-stating the evidence the ALJ built a logical bridge between the evidence of record and the ultimate conclusion that Plaintiff was "not entirely credible." (Tr. 20.)

## C. Weight Afforded to Treating Source Statements and Other Evaluations

Plaintiff also argues that the ALJ's assessment of several treating source statements is lacking. He contends that the ALJ in this case demonstrated the same lack of familiarity with bipolar disorder that the Seventh Circuit addressed in *Bauer v. Astrue*:

> Many of the reasons offered by the administrative law judge for discounting the evidence of Drs. Caspary and Chucka suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participator [sic] in group therapy," is "independent in her personal hygiene," and takes care of her 13-year-old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days. But the administrative law judge disregarded uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the laundry, and helps with the grocery shopping. And Caspary and Chucka, having treated the plaintiff continuously for three years, have concluded that she cannot hold down a full-time job.

532 F.3d 606, 608 (7th Cir. 2008); *see also Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011) (commenting that "many of the Social Security Administration's administrative law judges seem poorly informed about mental illness"). This case differs significantly from *Bauers*, however, in that here, at the same time he claimed he could not work, Plaintiff managed to complete an MBA with a B average, send out applications and interview for jobs, care for his three school-age children

part-time, attend their various activities, date, bicycle, and attend regular therapy and alcoholics anonymous meetings. (Tr. 20, 135.) These activities are not typical of someone who, because of a physical or mental impairment, is unable to perform any gainful employment.

Under Social Security regulations, treating sources are afforded special consideration. An ALJ must give treating source opinions "controlling weight" provided such opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. SSR 96-8p; *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). Here, Plaintiff argues that the ALJ skipped portions of Dr. Thomas Beld's opinion. Dr. Beld is one of Plaintiff's treating psychiatrists.

The ALJ actually did discuss Dr. Beld's treatment of Planitiff in his decision. (Tr. 15, 21-22.) The ALJ noted that Dr. Beld had diagnosed Schramm as having an anxiety disorder, not otherwise specified, after an initial visit on October 13, 2008. He concluded this condition was not medically determinable, however, because "there is no reliable evidence to suggest that this will persist for 12 consecutive months with appropriate treatment." (Tr. 15.) The ALJ also commented on a November 3, 2008 Psychiatric Continuation Claim Form, Attending Physician's Statement completed by Dr. Beld in which he wrote: "doubtful he will return to work." (Tr. 21.) The ALJ rejected this opinion because "the doctor provided little by way of rationale to support his speculative opinion, and the doctor only began treating the claimant in October 2008." (Tr. 21-22.) The ALJ also declined to give much weight to Dr. Beld's statement because it appeared to rely heavily on the subjective statements of Schramm (whom he had found not entirely credible), the opinion that Schramm was completely disabled was not supported by Dr. Beld's contemporaneous progress notes, and the opinion was on an issue reserved to the Commissioner. (Tr. 22.) *See* 20

13

C.F.R. § 404.1527(e) (statement by medical source that applicant is "disabled" or "not able to work" are not given any special significance because they bear directly on issues reserved to the Commissioner); *see also Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (noting "the ALJ is not required to give controlling weight to the ultimate conclusion of disability-a finding specifically reserved for the Commissioner").

Plaintiff's criticism of the ALJ, however, is directed not toward his analysis of the evidence from Dr. Beld that was before him at the hearing. Rather, Plaintiff contends that the ALJ failed to specifically address Dr. Beld's letter dated May 6, 2009, in which he asked the Agency to reconsider the decision denying Schramm's disability claim. (Tr. 536.) In his letter "to whom it may concern," Dr. Beld repeated his opinion that Schramm was completely disabled. Dr. Beld then went on to note, based on what Schramm had since reported to him, that he was apparently mistaken in his statement in his initial evaluation that Schramm had worked for a two-week period after he earned his MBA. Dr. Beld then commented on the apparent inconsistency between Schramm's claim of total disability and his successfully obtaining an MBA:

> As regards the fact that Scott earned an MBA, I have seen many patients function academically who suffered serious exacerbations of symptoms and inability to work once they achieved graduation and actually faced employment. His achievement of an MBA does not in any way correlate to full ability to work, in my experience with many patients.

(Tr. 536.)

As the Commissioner points out, however, this letter – which was dated three months *after* the February 2009 hearing – was not before the ALJ when he issued his decision on April 1, 2009. Although the ALJ mistakenly referenced Exhibit 26F in his decision (Tr. 20, 22), it is clear from the references that he actually meant Exhibit 25F. (Tr. 526, 532, 530-34.) Exhibit 26F was one of

14

the exhibits submitted by Schramm's sister after the hearing and considered by the Commissioner in denying Plaintiff's request for review. (Tr. 5.) The ALJ therefore cannot be faulted for failing to address it in his decision.

Nor was it error for the Commissioner to deny review notwithstanding Dr. Beld's May 2006 letter. The Commissioner was not required to accept Dr. Beld's statement, based as it was on Schramm's report to him, that Schramm had not previously told Dr. Beld that he worked for two weeks after obtaining his MBA. After all, the ALJ had already found Schramm less than credible. Moreover, Schramm had apparently made a similar report to his previous psychiatrist, Dr. Sovine. As noted above, he told Dr. Sovine in October of 2006 that he was working part-time and attending school part-time because it worked out better for him than doing either full-time. (Tr. 461.)

The Commissioner was likewise not required to accept Dr. Beld's opinion that Schramm's successful effort to obtain an MBA said nothing about his ability to work. There is no evidence in the record that suggests that Dr. Beld had some special knowledge of the academic rigors required to obtain an MBA. The ALJ concluded that Schramm's ability to maintain a B average while completing the required courses for an MBA, even if allowed 50% more time for tests than other students in a "distraction reduced environment" (Tr. 233), along with the other activities he undertook, belied his claim that he lacked the mental capacity to hold full-time employment requiring only simple, repetitive tasks. This conclusion is not unreasonable, notwithstanding Dr. Beld's opinion to the contrary.

More importantly, Dr. Beld's opinion that Schramm's attaining an MBA was not inconsistent with total disability was already implicit in his original opinion. It was clear in his initial evaluation that Dr. Beld was aware that Schramm had recently graduated with an MBA. (Tr.

15

533.) For this reason, the evidence was not new, and the Appeals Council did not err in denying Schramm's request for review. *See Getch*, 539 F.3d at 483-84 (noting that Appeals Council will review a case if the claimant submits "new and material evidence" that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision "contrary to the weight of the evidence" in the record) (citing 20 C.F.R. § 404.970(b)).

The ALJ also explained why he rejected similar forms filled out by Dr. Sovine (Schramm's previous psychiatrist), Mary Lambrecht (his therapist), and Dr. James Gallagher, a physician who apparently reviewed Schramm's file for his private disability insurer. (Tr. 21.) The ALJ noted that each of the opinions that Schramm was unable to work was stated in a conclusory fashion that invaded the province of the Commissioner, and that Dr. Sovine's and Ms. Lambrecht's opinions were not supported by contemporaneous progress notes and were based primarily on subjective complaints of the claimant with his suspect credibility. (*Id.*) The ALJ also noted that even Dr. Gallagher recognized the apparent contradictions in the record, "such as the claimant doing well in school and receiving a Global Assessment of Functioning ("GAF") score of 70 while at the same time being unable to work." (*Id.*) Finally, the ALJ noted that "a substantial amount of additional evidence has been submitted since 2006, and Dr. Gallagher had recommended that they continue to monitor the claimant's condition and perhaps have an independent medical evaluation in the future." (*Id.*)

Citing Dr. Sovine's 2004 responses to Schramm's private disability insurer's questionaires, Plaintiff argues that new evidence submitted by his sister to the Appeals Council after the hearing clearly demonstrates strong medical support for Dr. Sovine's opinion that his severe mental impairments rendered him unable to work. (Reply at 4, citing Tr. 248-50.) These records reflect

that Dr. Sovine had estimated Schramm's GAF at 50 in 2004, a fact that Plaintiff concedes was already in the record. (Tr. 258.) More importantly, however, Plaintiff notes that in these reports to his private disability insurer Dr. Sovine documented numerous symptoms precluding gainful employment, including "suicidal thoughts, severe depression, depressed affect, bipolar disorder, moderate to severe stressors, and a personality or emotional disorder with poor adaption or difficulty in many areas." On May 14, 2004, Dr. Sovine explained that Schramm had no ability "to function in any job function , no concentration, severe depression inability to communicate with others." (Tr. 251.) On August 10, 2004, Dr. Sovine opined that Schramm's conditions were unlikely to improve and that they were chronic, characterized by exacerbations and remission of unpredictable length, timing, frequency, and intensity. (Tr. 253.) Based on this evidence, Plaintiff suggests, the ALJ's rejection of Dr. Sovine's opinion cannot stand.

Like the May 2009 letter from Dr. Beld that was submitted after the hearing in support of Schramm's request for review, however, this evidence was considered by the Appeals Council and found not to warrant further review. (Tr. 1, 5.) In denying Schramm's request for review, the Appeals Council found in effect that additional reports did not constitute new and material evidence that made the decision of the ALJ contrary to the weight of evidence in the record. 20 C.F.R. § 404.970(b). Judicial review is "de novo whether the Appeals Council made an error of law in applying this regulation; absent legal error, however, the Council's decision whether to review is 'discretionary and unreviewable.'" *Getch*, 539 F.3d at 483-84 (quoting *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir.1997)). Here, there was no legal error. The referenced statements setting forth Dr. Sovine's opinions, like the initial intake interview by DVR, reflect Schramm's condition in 2004 in the months following his March 2004 inpatient admission at Mercy Medical Center in

17

Oshkosh when he was non-compliant with treatment and had relapsed into alcohol abuse. (Tr. 257, 298-300). The records concerning that admission were already part of the record before the ALJ, as were Dr. Sovine's progress notes from Schramm's office visits over the same period of time covered by his statements to Schramm's disability insurer. (Tr. 257-68, 298-312.) Thus, the evidence does not appear new.

Nor is it material. There appears to be no dispute that Schramm was hospitalized in March of 2004 for a major psychiatric episode and was unable to work at that time. The question before the ALJ, however, was whether such inability to work remained and was present at the time of the hearing before the ALJ. As the ALJ noted, "a substantial amount of additional evidence ha[d] been submitted since 2006" (Tr. 21), and it was that more recent evidence that formed the basis of the ALJ's decision. By June 2005, the year after his hospitalization, Schramm was reporting to Dr. Sovine that he was doing much better, though still with bad days, and was enrolled in the MBA program at UW-Oshkosh. (Tr. 317.) It was not error for the Commissioner in reaching his decision in 2009 to place little weight on evidence concerning Schramm's condition back in 2004 when he was drinking and noncompliant with treatment. For these reasons, the ALJ's consideration and analysis of these medical opinions is sound and finds substantial support in the record.

The Plaintiff next criticizes the ALJ for failing to address the neuropsychological evaluation of Schramm by Dr. David Leicht. (Tr. 332-338.) Dr. Leicht evaluated Plaintiff in April and May of 2005 at the request of Plaintiff's treating psychologist, Dr. Sovine. The evidence of record indicates that Dr. Leicht met with Plaintiff at least twice and authored a detailed report. (*Id.*) Plaintiff notes that the ALJ must consider *conflicting* medical opinion evidence in the record. In assessing such evidence, Plaintiff notes that the ALJ must consider a variety of factors, including

whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d). Here the ALJ did not mention Dr. Leicht or discuss his report.

But as the Commissioner observes, Dr. Leicht's report did not contain any opinion or findings that conflicted with the RFC that the ALJ found. At no point did Dr. Leicht state that Schramm would be incapable of simple, repetitive work. True, Dr. Leicht found that Schramm had attention problems, trouble organizing and manipulating information, was easily frustrated, and his concentration skills were weak. (Tr. 334.) He also found Schramm had "significant attention/concentration problems" and he had difficulty sustaining attention to a task for more than five minutes. (*Id.*) It is also noteworthy that his findings were based not only on Schramm's self-reports, but also on a series of psychological tests and instruments. (Tr. 334.) Certainly, it would have been helpful for the ALJ to address Dr. Leicht's findings.

On the other hand, it is clear that the ALJ reviewed the report and considered some of Dr. Leicht's findings in his decision. He referenced Dr. Leicht's report in noting that Schramm had problems with attention and concentration. (Tr. 15.) Despite those difficulties, Dr. Leicht found it noteworthy that Schramm was able to maintain a B average in his MBA program. (Tr. 20, 331.) Dr. Leicht also expressed surprise that Schramm was doing so well even though he was receiving no tutoring or other assistive services. (Tr. 338.) Finally, much of what Dr. Leicht reported was cumulative to what other experts had said about Schramm. Under these circumstances, it was not error for the ALJ to more directly address Dr. Leicht's report. *See O'Connor-Spinner v. Astrue,* 627

F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions.").

**D. Weight Afforded to State Agency Reports and RFC Formulation**

Plaintiff also challenges the ALJ's use of the State Agency consultants' reports in arriving at Schramm's RFC and his formulation of the RFC. In reaching his conclusions regarding Plaintiff's mental impairments the ALJ stated that he gave "the greatest weight" to the opinions of the State Agency consultative psychologists "but less weight" to Dr. Sovine, a treating psychiatrist, and Ms. Lambrecht, a treating therapist. (Tr. 21.) Plaintiff argues that the ALJ failed to properly consider and account for the moderate impairments found by the State Agency consultants when he made his findings of RFC. Despite the fact that the ALJ gave the consultants' opinions the greatest weight, Plaintiff argues he seems to have ignored several of their findings.

To understand Plaintiff's argument, it will first be necessary to describe how the Social Security Administration ("SSA") evaluates mental impairments. The SSA uses a "special technique" to determine whether a mental impairment is severe and whether it meets the criteria for one of the Listings for mental impairments in Part A of the Listing of Impairments. 20 C.F.R. § 1520a. The special technique used to evaluate mental impairments requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he has a medically determinable mental impairment. 20 C.F.R. § 1520a(b)(1). If a mental impairment is found, SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 1520a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five point scale: none, mild, moderate, and extreme. The degree of limitation

for episodes of decomposition is rated on a four-point scale: none, one or two, three, four or more. These ratings are then used to determine whether the mental impairment is severe and, if so, whether it meets the criteria of one of the Listings for mental impairments. If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at step three of the SSA's sequential evaluation process. 20 C.F.R. § 1520(d). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then the SSA assesses the claimant's RFC. 20 C.F.R. § 1520a(c)(3). A Psychiatric Review Technique Form ("PRTF"), signed by a medical or psychological consultant, is used to document the various steps required by the special technique to evaluate a mental impairment. A second form, the Mental Residual Functional Capacity Assessment ("MRFCA"), is used to document the evaluation required when the claimant's impairment, though severe, does not meet or exceed the criteria of a Listing. The use of these forms is explained in the SSA's Program Operations Manual System ("POMS"), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* DI 24505.025 and DI 24510.060.

In July 2006, Psychologist Eric Edelman evaluated Schramm's mental impairments using the SSA's special technique and completed a PRTF after reviewing the file. (Tr. 403-16.) In the PRTF he completed, Dr. Edelman checked boxes indicating Plaintiff had affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders. (Tr. 403.) In rating the degree of Schramm's functional limitation on the B criteria of the applicable Listings, Dr. Edelman noted that he had mild limitations in activities of daily living and maintaining concentration, persistence and pace; a moderate limitation in maintaining social functioning; and one or two episodes of decomposition. (Tr. 413.) The limitations noted by Dr. Edelman indicated

that Schramm had a severe mental impairment, but they did not meet the B criteria for the applicable listings, and Dr. Edelman also found that Schramm did not meet the additional C criteria of the Listings that applied. He therefore proceeded to assess Schramm's RFC using the MRFCA form. (Tr. 417-20.)

The MRFCA form includes a section entitled "Summary Conclusions." There the form lists twenty mental health functions grouped under four main categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. To the right of each of the mental health functions is a series of decision checkblocks under the headings: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. DI 24510.060. At the end of the form is a space under the heading "Functional Capacity Assessment" where the actual mental RFC is to be recorded in narrative form. *Id*.

In completing the MRFCA, Dr. Edelman checked that Schramm was moderately limited in eight mental functions, including: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods of time; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 417-18.) On November 1, 2006, another

Agency Consultant, psychologist William Merrick, affirmed the PRSF and MRFCA completed by Dr. Edelman. (Tr. 448.)

Plaintiff first argues that the ALJ erred in failing to incorporate the various moderate impairments the State Agency consultants found into his RFC. He notes that the ALJ reasoned that the "moderate limitations given in the MRFCA by Dr. Edelman deserved no weight because they were "summary conclusions":

> While the claimant's representative focused in both a brief and at the hearing upon the number of moderate limitations given in Exhibit 9F [Tr. 417-20] by a State Agency consultative psychologist (Exhibit 12E, p. 3 [Tr. 182]), those moderate limitations are "summary conclusions" and are not an opinion regarding the claimant's mental residual functional capacity. While the claimant's representative may define a "moderate" limitation any way he likes, his definition is not that of the State Agency consultative psychologists, who ultimately concluded that the claimant is able to work despite those limitations, nor is the representative's definition of "moderate" substantiated by the objective medical evidence and the claimant's activities.

(Tr. 21.) Citing SSR 96-6p, Plaintiff argues that the ALJ erred in rejecting the moderate limitations documented by the State Agency consultative psychologists.

In fact, however, the ALJ's treatment of the limitations documented by the State Agency consultants in the MRFCA was entirely consistent with SSA's own guidelines for completing that form. According to the POMS, "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060 (bold original). The Third Circuit recently rejected this same argument in *Smith v. Commissioner of Social Sec.*, citing several district court decisions that had previously reached the same conclusion:

> Numerous district courts in this circuit have recognized this point and held that Section I of the form may be assigned little or no weight. *See Molloy v. Astrue*, No.

23

08-4801, 2010 WL 421090, at *11 (D.N.J. Feb.1, 2010) ("According to the Social Security Administration's internal operating guidelines ..., this section of the examination form does not constitute the RFC assessment but rather is merely a worksheet to aid employees. Therefore, [the ALJ] was not required to assign any weight to this part of the report because it was not the final RFC finding." (internal quotation marks and citation omitted)); *Liggett v. Astrue*, No. 08-1913, 2009 WL 189934, at *8 (E.D. Pa. Jan.27, 2009) (explaining that "Dr. Chiampi's actual mental residual functional capacity assessment [was located] in Part III of the Mental Residual Functional Capacity Form" and that "the undersigned does not accept the 'summary conclusions' in Part I as the assessment of the claimant's mental residual functional capacity here"); *Torres v. Comm'r of Soc. Sec.*, No. 07-1951, 2008 WL 5244384, at *12 (D.N.J. Dec.15, 2008) ("[T]he check blocks in Section I of the assessment do not constitute the assessment itself, but function rather as a worksheet to aid the physician in making an assessment. Therefore, the ALJ's hypothetical accurately reflected [the doctors'] opinion of Plaintiff's condition." (citation omitted)). The District Court also understood this point. *See Smith v. Astrue*, No. 08 Civ. 2875, 2009 WL 1372536, at *5 (D.N.J. May 15, 2009) ("As the Commissioner correctly notes, Section I is not the actual Residual Functional Capacity ('RFC') assessment, but rather a worksheet to aid in determining the presence and degree of functional limitations. Instead, the actual mental RFC assessment is found in Section III of the Form.").

631 F.3d 632, 636-37 (3rd Cir. 2010).

The *Smith* court also noted that the definition of "moderate limitation", as used on the form, has a specific definition. Quoting POMS DI 24510.063(B)(2), the court noted that consultants completing the MRFCA are instructed that "'moderately limited' should be selected when 'the individual's capacity to perform the activity is impaired.'" 631 F.3d at 637. The definition does not require that the individual's capacity be at a level that is unacceptable in a national workforce, however; "rather, the instructions specify that '[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III.'" *Id*.

Thus, the ALJ acted properly and in accordance with SSA's operating guidelines in looking to the narrative section of the MRFCA, rather than the worksheet, in determining what impact Schramm's mental impairments had on his ability to work. The checks on the worksheet simply

indicated some impairment, but it was in the narrative section of the report that the evaluators were required to set down their assessment of his mental RFC. Here, the ALJ interpreted the State Agency's notation to mean that Schramm retained an RFC for repetitive simple work, but as to this issue too, Plaintiff argues that the ALJ erred.

Plaintiff notes in his reply that the basis for the "simple repetitive" limitation in the ALJ's RFC is not clear. Counsel for the Commissioner states that "the ALJ assessed the limitation of 'simple, repetitive work' to take into account Plaintiff's mild difficulties in concentration, persistence, and pace." (Def.'s Resp. at 10.) But it is clear from the ALJ's decision that he based that limitation on the MRFCA completed by Dr. Edelman and affirmed by Dr. Merrick. In the space for the narrative under the heading "Functional Capacity Assessment" on the Dr. Edelman's MRFCA appears the notation "See EWS summary," which is an apparent reference to the Agency's electronic worksheet. (See Tr. 73 referencing Exhibit 10F, page 2) The summary in the electronic worksheet reads:

> Psych; The Claimant has been diagnosed with a bipolar disorder and is noted to exhibit cluster B traits. A diagnosis of ADHD has also been entertained. However, he is cognitively intact, autonomous on ADLs, is socially active and is currently pursuing his MBA. He does exhibit some maladaptive coping mechanisms, but is clearly capable of performing at least RLSW.

(Tr. 421-22.) The ALJ interpreted RLSW to mean "repetitive simple work" and incorporated it into his RFC. (Tr. 73.)

Plaintiff questions the ALJ's interpretation of "RLSW," suggesting it might mean "repetitive low stress work." (Pl.'s Reply at 8, n.1.) More importantly, Plaintiff argues that it is not even clear that the notation, whatever it means, was authored by Dr. Edelman. The assessment on which the ALJ relied bears the initials TFB and appears in Exhibit 10F, which is an unsigned computer

worksheet entitled Case Development Worksheet. Plaintiff notes that TFB is a lay disability examiner named Thomas F. Bates, who worked on the case. (Reply at 9 (citing Tr. 79.)) Since Bates is not a doctor, Plaintiff argues he is not qualified to give an opinion and, as a result, the ALJ's RFC determination is not supported by substantial evidence.

While the record is not as clear as one would wish, one can reasonably trace the ALJ's reasoning. Apparently, Dr. Edelman meant to incorporate the Case Development Worksheet summary as his narrative description of Schramm's functional capacity assessment on the MRFC form. The SSA's operating procedures appear to permit him to do so. "The medical consultant or psychological consultant is responsible for assessing RFC when an RFC is required. Disability examiners may assist the medical or psychological consultant in completing the RFC form." DI 24510.066. And even without express authorization, there is no reason why a consultant cannot incorporate by reference in his own report findings contained in another document. Having signed the form, Dr. Edelman effectively adopted the narrative summary contained in the worksheet. Thus, the ALJ did construct a logical bridge between the evidence in the record and his finding that Schramm had an RFC to perform repetitive simple work.

Plaintiff also claims the ALJ's RFC formulation was deficient because it states the *least* Schramm can do rather than the *most*. Plaintiff claims that the ALJ erred in using the words "at least" in formulating Schramm's RFC. Because "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*" SSR 96-8(p) (emphasis in original), Plaintiff argues that by using the words "at least" the ALJ did not explain the maximum level of complexity of the work that Schramm would be able to do despite his conditions.

Plaintiff would have a point if the ALJ had then found that Schramm was capable of performing work the required more than simple, repetitive work. But the ALJ did not so find; he found that Schramm could perform his previous job as a salvage laborer, which the ALJ concluded was simple and repetitive. By saying Schramm could perform "at least simple, repetitive work" at all exertional levels, the ALJ was suggesting that there was evidence that he could even perform work that was not simple and repetitive. The ALJ adopted the "simple, repetitive" qualification, however, to indicate that the evidence supported no greater limitation. Phrasing the RFC finding in this way, presumably for rhetorical effect, did not cause any prejudice.

Plaintiff also argues that the ALJ erred in formulating his RFC in failing to account for Schramm's ability to work on a sustained basis. "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. There is a "difference between a person's being able to engage in sporadic physical activities . . . and being able to work eight hours a day five consecutive days of the week" *Carradine v. Barnhardt*, 360 F.3d 751, 755 (7th Cir. 2004).

It is clear from his decision, however, that the ALJ rejected Plaintiff's claim that he was unable to work on a sustained basis. As already noted, the ALJ found Schramm's own testimony not credible as to his degree of limitation and placed great weight upon the State Agency consultants, who did not list such a limitation in their mental RFC assessment. The ALJ also explained why he rejected the opinions of those medical sources who at various points in time

thought Schramm incapable of sustained work. Having explained his reasons for rejecting such evidence, no further discussion of the issue was required.

Plaintiff's last challenge to the ALJ's RFC formulation also relates to his reliance on the reports of the State Agency consultants. In completing the PRTF, Dr. Edelman had checked the box indicating that Schramm had a moderate degree of limitation in maintaining social functioning. The ALJ appears to have expressly adopted this finding in concluding that Schramm did not have a listed impairment, stating "[i]n social functioning, the claimant has moderate difficulties." (Tr. 16.) As even counsel for the Commissioner appears to concede, this would "[t]ypically . . . lead to the RFC incorporating a limitation in social functioning." (Defendant's Br., Dkt. 13, at 10.) Plaintiff argues that the ALJ erred in failing to include such a limitation in his RFC.

Here, however, the ALJ did not include a social functioning limitation in Schramm's RFC. Instead, the ALJ explained that "limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of the mental impairments at steps 2 and 3 of the sequential evaluation process." (Tr. 17.) The mental residual functional capacity assessment used at steps 4 and 5 of the process, the ALJ continued, "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorder listings in 12.00 of the Listing of Impairments." (*Id.*)

Here, too, the ALJ's reasoning finds support in the SSA's own procedures. SSR 96-8p, referenced by the ALJ and cited repeatedly by Plaintiff, makes the same point:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various

functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p, 1996 WL 374184, *4 (S.S.A. July 2, 1996). And since the State Agency consultants on whom the ALJ placed the greatest weight did not include a social functioning limitation in their more detailed RFC assessment, the ALJ found no reason to include one at step four of the sequential evaluation.

As Plaintiff points out, the ALJ's decision (and perhaps the SSR as well) seem inconsistent with Seventh Circuit law on the issue. Indeed, in *Stewart v. Astrue*, the court held that not only did the ALJ err in failing to include a "B criteria" limitation in the RFC, but the Commissioner lacked any substantial basis for arguing to the contrary. 561 F.3d 679, 684 (7th Cir. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record."). In support of its ruling, the *Stewart* Court cited a series of cases from this and other circuits. *Id.* Given this precedent, Plaintiff's argument carries some weight.

This case is distinguishable on two grounds, however. First, *Stewart* and the cases it cites seem to all involve a limitation of concentration, persistence, and pace, as opposed to social functioning: "More specifically, the question must account for documented limitations of "concentration, persistence or pace." *Id*. at 685. More importantly, the ALJ supported his reason not to include a social functioning limitation in his RFC by not only referring to the mental RFC assessment completed by the State Agency consultant, but also by referencing the evidence of how Schramm actually functioned. The ALJ noted that "the longitudinal evidence supports only a mild limitation [in social functioning]." (Tr. 16.) In support of his finding, the ALJ noted that "the

29

claimant reported engaging in all kinds of social interaction, including spending time with his three minor-age children, attending graduate school, going to Alcoholics Anonymous meetings, applying for jobs and attending interviews, and dating." (*Id*.) The ALJ's analysis demonstrates a logical bridge between the record and his RFC determination. Given the deferential standard with which such determinations are reviewed, I conclude it should stand.

**E. Analysis of Past Relevant Work**

Finally, at step four of the sequential process used to analyze disability claims, the ALJ must determine whether a claimant can still perform specific, essential mental and physical functions of his past work despite any impairments he may have. *Smith v. Barnhart,* 388 F.3d 251, 252-53 (7th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(iv). So, for example, if a prior job required typing, the ALJ must decide whether the claimant can still type. *Id.*

Here, the ALJ found that Plaintiff could return to one of his past jobs as a "plant manager, product specialist" at Madison General Fuels, a recycling facility. Plaintiff worked at Madison General for three months in 2003. As he described the job, the Vocational Expert characterized his position as more of a lead person than manager, since he had no hiring or firing responsibility and worked with two other employees. Plaintiff testified that his job at the recycling facility involved him operating a "custom machine that would turn paper products into pellets" and "manag[ing] . . . one or two people that would help load . . . [the] machine." (Tr. 33.) In that position Plaintiff would spend seven and a half hours a day standing or walking and would often lift 100 pounds. (Tr 33-34.) Plaintiff stated that he "did the same thing every day, repetitive, taking paper out of a vat, and off pallets, and loading it into a shredder . . .". (Tr. 50.)

The Vocational Expert testified that this position fell within the Dictionary of Occupational Titles classification of Salvage Laborer, and that a person with an RFC limiting him to simple, repetitive work would be able to perform such work as described by the Dictionary of Occupational Titles or as Plaintiff described his actual job at Madison General. Based upon the Vocational Expert's testimony, the ALJ then found that Schramm could perform work as a Salvage Laborer as generally performed or as actually performed by him in his previous position at Madison General. Accordingly, the ALJ concluded he was not disabled. (Tr. 22.)

Plaintiff takes issue with the process the ALJ employed to reach this conclusion. Plaintiff contends that at step four, the ALJ failed to list the specific physical requirements of the Salvage Laborer position and assess, in light of the available evidence, Plaintiff's ability to perform these tasks. (Plaintiff's Br. at 19.) In fact, Plaintiff contends that the Vocational Expert erred in characterizing the work of a Salvage Laborer as simple, repetitive work. Pointing to the actual definition of the position in the Dictionary, Plaintiff argues it contains "a multiple tasks and materials not mentioned in the record and none of the tasks mentioned as having been performed by Schramm." (Pl.'s Br. at 18.) Plaintiff faults the ALJ for not laying out the specific duties involved in Plaintiff's prior work as a Salvage Laborer. In support of his argument, Plaintiff cites *Nolen v. Sullivan,* 939 F.2d 516, 519 (7th Cir. 1991), in which the court remanded the case for further proceedings because the ALJ did not describe "the tasks the [claimant's prior] job entailed." Because the ALJ here also failed to detail each of the tasks for Schramm's prior job or the general duties of a Salvage Laborer set forth in the Dictionary, Plaintiff contends a remand is required.

Plaintiff's reliance on *Nolen,* 939 F.2d 516, is misplaced for several reasons. First the Seventh Circuit has construed *Nolen* narrowly. In *Nolan* the Seventh Circuit held only that an ALJ

cannot describe a previous job in a generic way, e.g., "sedentary," and on that basis conclude that the claimant is fit to perform all sedentary jobs without inquiring into any differences in what the job requires while sitting. *Smith v. Barnhart,* 388 F.3d 251, 252-53 (7th Cir. 2004). Here, the ALJ, in reliance on the Vocational Expert, considered the specific job Schramm held, so *Nolen* is inapplicable. *See Cohen v. Astrue,* 258 Fed. Appx. 20, **8 (7th Cir. 2007) (unpublished opinion). Second, the *Nolan* case is distinguishable from the case at hand because in *Nolan*, the ALJ did not have the benefit of a Vocational Expert's testimony which specifically addressed Schramm's past relevant work. In the present case, the ALJ relied upon the vocational expert's opinion relative to the physical and mental demands of the work. (Tr. 22.)

More importantly, however, the ALJ here concluded that Schramm had no exertional limitations and the only non-exertional limitation he had was that he was restricted to simple, repetitive work. The ALJ then relied on Schramm's own testimony concerning his prior employment at Madison General to conclude that the work he previously did fell within the RFC the ALJ had found he retained. As noted above, Schramm himself described his prior employment as simple and repetitive, stating that he "did the same thing every day, repetitive, taking paper out of a vat, and off pallets, and loading it into a shredder . . .". (Tr. 50.) Indeed, Schramm suggested that the reason he left that job and went to school was due less to an inability to perform the job than boredom with it. When asked whether the reason he left that job was boredom, Schramm responded:

> You know, I don't know exactly what it would be. I mean, since - - I guess how I can tell you is the reason why I even went to school all this time is because I didn't want to do that. I didn't want a job at a mill folding napkins or I didn't want to - - you know, I just - - I never pictured myself doing that. I'm not saying I definitely couldn't do it for a week, or two weeks, or a month, but from my past history like

at the mill when I worked at Madison General Fuels I did the same thing there every day, repetitive taking paper out of a vat, and off of pallets, and loading it into a shredder, and I lasted three months.

(Tr. 50.)

Given this testimony and the absence of any non-exertional limitations, the ALJ's failure to undertake a detailed analysis of each task required in Schramm's previous employment at Madison General Fuels before concluding he could perform that job was not error. Accordingly, he is not entitled to relief on this basis.

## CONCLUSION

The ALJ fully and fairly developed the record, and carefully considered the evidence. He built a logical bridge between the evidence and his conclusion, and substantial evidence supports it. Finding no legal error in his analysis, I conclude that the decision of the Commissioner should be affirmed. The Clerk shall enter judgment accordingly.

**SO ORDERED** this ___31st___ day of March, 2011.

s/ William C. Griesbach
William C. Griesbach
United States District Judge